Filed 12/3/25  In re M.N. CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| In re M.N., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B345656 (Super. Ct. No. 19JV00365-A) (Santa Barbara County) |
| THE PEOPLE,    Plaintiff and Respondent,  v.  M.N.,    Defendant and Appellant. | |

M.N. appeals from the juvenile court's order transferring him to criminal court.  (See Welf. & Inst. Code,[1] § 801, subd. (a).)  He contends insufficient evidence supports the transfer order.  We will affirm.

---

[1] Unlabeled statutory references are to the Welfare and Institutions Code.

## FACTUAL AND PROCEDURAL HISTORY
### *M.N.'s Background*

M.N. was "jumped" into Santa Maria's West Park gang in 2017, when he was 13. His school record noted extensive disciplinary issues around that time. This included fighting, tagging, smoking, and sexually harassing female classmates. M.N. received his first referral to juvenile court that year for misdemeanor battery after hitting a female on the buttocks with a ruler. The matter was resolved in Teen Court. He received a second referral in 2019 for robbery after taking a classmate's gold necklace. The juvenile court granted a section 602 petition for grand theft. He completed probation in May of 2020.

Police observed M.N. popping car tires with two co-offenders in October of 2021. He fled but officers found him hiding nearby with a 9mm pistol in his possession. This resulted in a third referral to juvenile court. Because M.N. had already been placed on adult probation the District Attorney declined to file a section 602 petition. M.N. changed high schools around this time but was again disciplined for fighting and smoking.

### *The Mall Shooting*

M.N. sent a text message to fellow West Park members on the morning of February 4, 2022 saying that he was angry at a member of a rival gang. He asked who had "straps," or guns, and said, "I have a ride jst nun to slide w." That night another West Park member picked up M.N. and two others in a white sedan. They drove to a mall parking structure where they suspected the rival gang member was attending a gathering of car enthusiasts. Security cameras showed the white sedan circling the structure's first and second floors for about 20 minutes. It then parked on the first floor immediately beneath the gathering. A passenger got out of the driver side passenger seat and walked toward the

2

stairwell.  He returned a short time later and the sedan sped out of the structure.

Police responded to reports of a shooting at the second level of the structure.  They found one man, Alexis Mendoza, dead from a gunshot wound to the head.  A woman suffered a wound to the leg and drove herself to the hospital.  Nine spent shell casings were found in a nearby stairwell.  Officers spotted a white sedan driving through West Park territory shortly after.  The sedan crashed into a muddy field after a brief chase.  M.N. and the other three occupants were detained, interviewed, and tested for gunshot residue.  M.N. had a large tattoo of a Glock-style pistol on the side of his head by this time.  Police cited M.N. for resisting arrest and released him to his mother.

Police found a 40-caliber pistol submerged in water in the field where M.N. was detained.  Firing tests confirmed its casings matched those found at the parking structure.  Footprints found near the pistol matched the shoes M.N. wore the night of the shooting.  Samples taken from his hands and waistband tested positive for gunshot residue.

*M.N.'s Subsequent Crimes, Belated Arrest*
*for Mall Shooting, and Jail Assault of an Elderly Inmate*

M.N. turned 18 in July of 2022.  He was charged with assault with a firearm in October for an unrelated incident in which he held a firearm to the head of the victim and asked "Where are you from?"  He received a sentence of 180 days in jail and two years of probation.  M.N. was charged with assault with a firearm a second time in September of 2023 after chasing a rival gang member down the street while holding a handgun.  This charge remains pending.

Police arrested M.N. on a probation violation in October of 2023.  He called the arresting officer a "faggot" and threatened to

"kick [his] ass" when he got out of jail. He was arrested in custody for the mall shooting in November of 2023 on a *Ramey* warrant.[2] During questioning he admitted sitting in the driver-side passenger seat on the night of the mall shooting. When officers told M.N. his co-suspect was being questioned in the adjacent room, he began yelling "Don't talk, don't talk" into the air vent.

M.N. and other Sureño gang members participated in a jail riot in December of 2023. Security cameras show M.N. and two others beating an elderly inmate who was watching television. M.N. continued to beat the victim in the head after he lost consciousness. The victim suffered fractures to his spine, nose, jaw, and neck. M.N. was charged with assault with force likely to cause great bodily injury, elder abuse, and inciting a riot. These charges are also pending. M.N. has three incident reports, the latest from August of 2024 when he tagged his gang moniker on a yard wall.

*Juvenile Court Grants Transfer Motion*

Prosecutors filed a four-count section 602 petition alleging first degree murder, attempted murder, conspiracy, and resisting arrest in connection with the mall shooting. Prosecutors moved to transfer M.N. to criminal court. M.N. opposed transfer. He submitted the report of a holistic defense advocate who examined him and his parents prior to the transfer hearing. The report attributes his worsening delinquency to, among other things, traumatic events such as the death of his grandmother and the

---

[2] A *Ramey* warrant authorizes a suspect's arrest at their residence before the filing of criminal charges. (*Goodwin v. Superior Court* (2001) 90 Cal.App.4th 215, 218, citing *People v. Ramey* (1976) 16 Cal.3d 263.)

birth of his little brother (M.N. stated the latter "pushed [him] out of the family"); the influence of West Park gang members; his father's harsh discipline; the harassment of rival gang members; and the disbanding of his wrestling team when he was 15. The report, as well as M.N.'s father, identified the juvenile court system as partly to blame because it was too lenient with M.N. and deprived him of the opportunity of participating in rehabilitation programs in custody. It stated he was ready to leave the gang lifestyle, as evidenced by his enrollment in college classes, his involvement in an STP program, and his desire to parent his infant daughter. When interviewed prior to the transfer hearing, M.N.'s mother stated he was "not capable" of murder and that he "can barely shoot a BB gun."

The juvenile court granted the motion, finding all five factors set forth in section 707, subdivision (a)(3) weighed in favor of transfer. It ordered him transferred to criminal court on April 18, 2025. He appeals the order. (§ 801, subd. (a).)

DISCUSSION

M.N. contends the juvenile court erred when it granted the motion to transfer. He argues clear and convincing evidence does not support the finding that he is not amendable to rehabilitation under the juvenile court's jurisdiction. We disagree.

When prosecutors allege that a minor aged 16 years or older has committed a felony, they may request the juvenile court transfer the minor to criminal court. (§ 707, subd. (a)(1).) Prosecutors must prove "by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3); Cal. Rules of Court, rule 5.770(a).) This requires the court to consider: (1) the minor's "degree of criminal sophistication," (2) "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile

5

court's jurisdiction," (3) "[t]he minor's previous delinquent history," (4) the "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor," and (5) "[t]he circumstances and gravity of the offense alleged . . . to have been committed by the minor." (§ 707, subd. (a)(3)(A)-(E).)

We review the juvenile court's findings on these five criteria and its "ultimate finding 'that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court'" for substantial evidence. (*In re Miguel R.* (2024) 100 Cal.App.5th 152, 165 (*Miguel R.*).) This requires us to "'determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by' the clear and convincing evidence standard." (*Ibid.*) Doing so, we conclude substantial evidence supports the juvenile court's findings as to each of the five factors listed in section 707, subdivision (a)(3).

*Criminal Sophistication*

When evaluating the degree of criminal sophistication exhibited by the minor, section 707 requires the juvenile court to "give weight to any relevant factor, including, but not limited to, the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense; the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior; the effect of familial, adult, or peer pressure on the minor's actions; the effect of the minor's family and community environment; the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery on the minor's criminal sophistication." (§ 707, subd. (a)(3)(A)(ii).)

6

The circumstances of the mall shooting demonstrate criminal sophistication. M.N. texted his West Park colleagues the morning of the shooting and asked who had guns and would accompany him. They drove to a place where they knew the intended victim would be based on a social media post that evening. They surveilled the parking structure for twenty minutes before parking beneath the gathering near a stairwell. This ensured easy access to the victim and quick egress from the scene. M.N. then disposed of his pistol in a puddle of mud when pursued by police officers following the car crash. After his arrest, he yelled "Don't talk!" to a suspect in the next room.

Appellant contends the juvenile court did not state whether it considered his age and maturity. This is not accurate. The juvenile court acknowledged appellant's age at the time of the offense (17 years, five months) and noted it was required to consider "whether or not the youth suffers from a lack of intellectual capacity or any physical, mental, or emotional issues that may mitigate a finding of criminal sophistication." It found no such mitigating factors existed. The court explained, "There's no evidence this offense was the result of impetuosity. It was not a rash offense. It was a planned offense, and it's a pattern that's consistent with the minor and his activities. He certainly does not suffer from a lack of intellectual capacity or any other physical, mental or emotional issues that mitigate a finding of criminal sophistication. He clearly understood the risks and consequences of his actions here."

*Rehabilitation Before Juvenile Court Jurisdiction Expires*

In determining whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction, "the juvenile court shall give weight to any relevant factor, including, but not limited to, the minor's potential to grow and mature."

7

(§ 707, subd. (a)(3)(B)(ii).) "The prosecution bears the burden of producing evidence of insufficient time to rehabilitate the minor. [Citations.] Expert witnesses may testify on the issue of the availability of treatment programs in the juvenile court system and the amenability of the minor to those programs." (*J.N. v. Superior Court* (2018) 23 Cal.App.5th 706, 721.)

M.N. contends the transfer reports prepared by probation (and cited by the court) fail to explain why programs such as interactive journaling, gang intervention, moral recognition therapy, and vocational training would not rehabilitate him before he turns 25. M.N.'s defense expert, in contrast, described his progress in custody over the prior year and opined he "was serious about his rehabilitation and . . . amenable to the courses offered to him."

While M.N.'s recent progress is commendable, the record contains ample evidence supporting the juvenile court's findings on this criterion. M.N. completed a "Life Choices and Crime Awareness" class when referred to Teen Court in 2017 and completed juvenile probation in 2020. This was followed by a string of gun and gang-related offenses both before and after his arrest for the mall shooting. Prosecution experts testified that M.N.'s deeply entrenched gang affiliation, ineffectiveness of prior interventions, and escalating violent behavior made it unlikely he would rehabilitate in the four years remaining of the juvenile court's jurisdiction. It was not required to credit the testimony of M.N.'s experts over the prosecutors' experts. (*In re J.S.* (2024) 105 Cal.App.5th 205, 212.)

*Previous Delinquent History*

When evaluating the minor's previous delinquent history, section 707 requires the juvenile court to "give weight to any relevant factor, including, but not limited to, the seriousness of

8

the minor's previous delinquent history and the effect of the minor's family and community environment and childhood trauma on the minor's previous delinquent behavior." (§ 707, subd. (a)(3)(C)(ii).)

M.N. contends the court's finding on this criterion "is not supported by substantial evidence because the evidence indicates that appellant's delinquent behavior was not serious." The record contradicts this assertion. M.N.'s elementary school records contain evidence of serious behavioral problems ranging from bringing a knife to school, hitting other students, taunting yard supervisors, and calling a school employee "Big Tits" and "Earthquake." In middle school he threatened and fought other students, graffitied school property, and broke classroom supplies. He sexually harassed a female student by calling her a "hoe" and a "slut," asking if she was "horny," and talking about her breasts. He received his first juvenile court referral (for battery) at age 12 after hitting a female student in the buttocks with a ruler. This was followed by a referral for grand theft at 15 and possession of a firearm at 17. This delinquent history supported transfer to adult court. (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 165.)

M.N. cites evidence that "childhood traumas had a major influence on his behavior." The juvenile court considered this evidence and did not find it persuasive. This was well within its fact-finding discretion. The purportedly traumatic events—e.g., the death of his grandmother, birth of his sibling, and disbanding of his childhood wrestling team—describe challenges typical of those experienced by all children. M.N. himself described his family as "very close," "hardworking, supportive and entertaining." He stated "[h]is parents have modeled the type of family he aspires to have with his own daughter." We agree with

9

the juvenile court that "the evidence does not demonstrate any significant childhood trauma or other factors within this criterion that mitigate against a finding for transfer . . . ."

*Success of Previous Attempts to Rehabilitate*

When evaluating the success of previous attempts to rehabilitate, the "court shall give weight to any relevant factor, including, but not limited to, the adequacy of the services previously provided to address the minor's needs." (§ 707, subd. (a)(3)(D)(ii).) M.N. acknowledges "significant interventions" by the juvenile court but contends "very little rehabilitative services were offered" to him. M.N.'s defense advocate as well as his father believed the services offered to him were too lenient and that his was led to believe his behavior had no consequences."

The juvenile court concluded prosecutors met their burden as to this criterion. Substantial evidence again supports the conclusion. M.N. completed "Crime Awareness and Life Choices" classes after his 2017 referral. During his pre-shooting probation, he completed El Joven Noble leadership program, a mentoring program through CommUnify, a Healthy Relationships class, and 16 hours of community service. This was in addition to services and interventions offered through the school district, particularly in high school. He was arrested twice more as a juvenile after completing this programming and only intensified his criminal lifestyle upon reaching majority.

*Circumstances and Gravity of the Offense*

In determining whether the circumstances and gravity of the offense support transfer to the superior court, "the juvenile court shall give weight to any relevant factor, including, but not limited to, the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime, the

10

level of harm actually caused by the person, and the person's mental and emotional development." (§ 707, subd. (a)(3)(E)(ii).)

The juvenile court described the mall shooting as "the most serious offense possible." It continued, "But also what's significant to the Court is, again, this was no rash, impetuous act by the minor. This was a planned killing of a rival gang member." The court confirmed, however, the seriousness of the crime was not the sole basis of its decision and that it "considered each individual criterion enumerated by the statute."

No dispute exists over the seriousness of the offense. M.N. suggests the degree of his involvement remains in question. This does not bear on our analysis because this criterion focuses on the petition's allegations. (*Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 189.)

DISPOSITION

The April 18, 2025 order transferring M.N. from juvenile court to criminal court is affirmed.

NOT TO BE PUBLISHED.

CODY, J.

We concur:

YEGAN, Acting P. J.          BALTODANO, J.

11

Gustavo E. Lavayen, Judge
Superior Court County of Santa Barbara

_____

Keilana Truong, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Taylor Nguyen and Jonathan J. Kline, Deputy Attorneys General, for Plaintiff and Respondent.